THOMAS N. BRADFIELD, petitioner-appellant,

*v.*

ELSIE K. BRADFIELD, defendant-respondent.

[Decided January 31st, 1927.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Foster, who delivered the following opinion orally:

"Petitioner charges the offense of adultery as the basis for a decree of absolute divorce, and specifically charges that the defendant, since her marriage, and on the 8th day of November, 1923, and at various times prior thereto committed adultery with Thomas P. Fay, in the borough of Manhattan, in the State of New York. As I stated in the course of the argument, I find, and it is admitted, that there is no direct proof in the case to establish the charge of the petition. I am asked to find the guilt of the defendant from certain circumstances and from the relation that has existed between her and the co-respondent, Fay, from the 22d or 23d day of March, 1923, to and including the 8th day of November, 1923. The circumstances, as I have found them from the record, are that about the 22d day of March, Dr. Bradfield, the petitioner, through his counsel, employed the Corbally Agency of Newark to secure some evidence to establish the fact that his wife was unfaithful, if she was; and on the 22d day of March it appears Mr. Dipper, one of the operatives employed by that agency, saw Mr. Fay in front of Mrs. Bradfield's home, but did not see him enter the house. The next occasion that Fay appears on the scene is on the 7th of April, 1923, when Fay entered the Bradfield home at four-thirty P. M. and left at five-thirty. He returned in a short time in a taxicab and took Mrs. Bradfield and her mother to a Newark theatre. Later, they went to a hotel, the Hotel Riviera, in Newark,

for something to eat, remained there for some time, again got in a taxicab and took Mrs. Bradfield's mother, Mrs. Erwin, to her place of residence in the Lincoln Hotel, in Newark, and from there they went to Mrs. Bradfield's house, but did not drive directly there, and stopped the taxicab some distance away. Mrs. Bradfield got out and was followed by Mr. Fay at an interval of about five minutes, as the detective states. She entered the house and Fay entered it after her. Mr. Dipper, one of the operatives, says Mr. Fay left the house at eleven forty-five, and is contradicted by Mr. Cunningham, who was with him. Dipper states Fay remained in the house a half hour, and Cunningham says Fay remained in the house two hours. They both say there were lights on in the house all the time Fay was there.

"The next occasion is the 10th of April. They were seen in Asbury Park that afternoon. They took a taxicab and it appears that the detectives were informed they were taken to Avon. It appears further that Mrs. Erwin has a home in Belmar, near Avon. Mrs. Bradfield and Mr. Fay have no remembrance of this incident and do not deny it, and it appears that the detectives saw Mr. Fay put Mrs. Bradfield on the seven-twenty P. M. train from Long Branch to Newark on that occasion. On April 11th, Fay and Mrs Bradfield were seen to enter the Maxine Elliott Theatre—in fact, they were followed there—and after the matinee they were lost trace of. Mrs. Bradfield was seen to return home about midnight, but returned alone. She does not account for her absence after the close of the matinee, but Mr. Fay states he went home on the five-ten train, and there is no contradiction of it.

"On the 17th of April the detectives saw Fay enter the house at seven-thirty P. M. and leave at eleven twenty-five P. M. When he entered there was a light burning in the girls' room, which was extinguished at nine forty-five. The light continued burning in the kitchen, which the detective describes as 'back of the parlor.'

"On April 14th Mrs. Bradfield was seen walking on Park avenue near her home with Fay following her, and they were

seen to enter the house at nine-twenty P. M., and it is testified that Fay left there at eleven-five. That is all that is testified to with respect to that date. Mrs. Bradfield and her daughters state other members of the family were always at home when Mr. Fay called on her. Next comes the important occasion, the 8th of November. The witnesses for the petitioner state that about two-thirty o'clock in the afternoon Mrs. Bradfield was seen leaving her home. There seems. to be some question about where she was for two hours after that, but she agrees with the detectives that she took the four-thirty train from the Pennsylvania station at Market street, Newark, to New York. She arrived at the Pennsylvania station, claims she went in the ladies' room and after she came out she says she saw Mr. Fay in the main corridor talking to some man, that he stepped aside and spoke to her and then that she explained in answer to his inquiry that she was over to go to the theatre that night. The witnesses for the petitioner state that Mr. Fay did not meet her in the corridor, but that he met her down at the lower train shed, where the trains arrive, and escorted her through the station to the Pennsylvania Hotel. She states that Mr. Fay escorted her to the Pennsylvania Hotel, and she states that when she informed him that she was about to go to a hotel that night, she told Fay that because of an experience her aunt had had about a year before in being held up by footpads in the Forest Hill section, she had become frightened and didn't like the idea of returning home late, whereupon Mr. Fay suggested he was going to a banquet and he would have to change his clothes, and in order to do so he would have to get a room, that he wouldn't occupy the room over ten or fifteen minutes, and when he had vacated it she was welcome to occupy it for the balance of the night after the theatrical performance. As this conversation was progressing they finally reached the lobby of the Pennsylvania Hotel. Mrs. Bradfield went toward the elevator and Fay approached the room clerk's desk. Apparently, he was assigned to room 232 and registered, as appears in the record, at five-thirty, as 'Mr. and Mrs. Thomas P. Fay, Long Branch, New Jersey.' He then, according to the admission of Mrs. Bradfield, joined her in

the elevator and they went to the mezzanine floor, where she got out. She says she remained seated at the mezzanine floor until Mr. Fay came down, having dressed for the banquet, and gave her the key to the room. She then says he left her; she went downstairs in the restaurant and had something to eat, and then, because she had so much time on her hands, she concluded to walk to the theatre at Forty-seventh or Forty-eighth street, instead of taking any conveyance. She stayed during the entire performance, and in walking from the theatre back to the hotel, she had on a new pair of pumps, walking in which caused a blister to form on her heel. That when she reached the hotel, between eleven and eleven-fifteen, having the key which Fay had given her, she went to room 232. She admits she removed all her clothes, except possibly a skirt, although the detectives say she was wholly undressed and was wrapped in a blanket at the time they entered. She had some water running in the bathtub preparing to bathe the blister on her heel when a tap came on the door. She opened it and admitted Mr. Fay. In the meantime, friends of the petitioner, his brother-in-law, Mr. Ross, his physician, Dr. Morrison, Inspector Corbally, the inspector's son, and one or two others from the Corbally Agency, and hired and were in room 233, diagonally opposite room 232, and before the arrival of Mrs. Bradfield some of this party had inspected room 232 while a maid was in there preparing it for the night. There is quite a little discrepancy in the testimony as to the condition of that room at that time. Whether one or more of the beds had been disturbed or occupied, whether there was only the bed clothing which had been thrown back by the maid as if preparatory for occupation for the night, whether there was a pillow in the center of the bed, and whether one or both beds were disturbed and whether such disturbance was caused by the maid or not.

"In view of the fact that the maid was in the room prior to the time the inspection was made—they do not say how long she was there before they came—she had the opportunity to disturb the bed clothing and put the pillow in the middle of the bed while preparing the beds for the night. At any rate, she left the room in a very short time, having tidied it

up, fixed the beds and closed the door, and shortly there-
after Mrs. Bradfield entered the room, disrobed, as I have
stated, and then Mr. Fay entered.  Mr. Fay had his over-
coat on his arm, his hat in his hand, and had hardly reached
the middle of the room and the door had not entirely closed
on him when the party of friends and detectives of the peti-
tioner came across from room 233 and entered room 232.
They found Mrs. Bradfied standing by the door wrapped in
a blanket, with part of her shoulders exposed.  They found
Mr. Fay standing in the room with the overcoat over his
arm and his hat in his hand.  Inspector Corbally asked Mr.
Ross and Dr. Morrison for an identification of the woman,
and they identified Mrs. Bradfield.  He personally knew Mr.
Fay.  Mr. Flarity says Mr. Fay asked why he didn't tip him
off.  Fay denies this.  Mrs. Bradfield refused to dress
until directed to by Mr. Fay and then she complied.  Then,
when she was dressed she left for the street and the others
also left for the street.  According to the hotel detectives Mr.
Fay paid the bill, which was about $7.  It appears that Mrs.
Bradfield had no bag with her, no evening apparel, no toilet
articles of any kind, and, apparently, if she was going to
occupy the room for the night she had come wholly unpre-
pared to do so.

"That is the petitioner's case, in substance, and although
there is no direct proof of adultery having been committed, I
am now asked to find from these circumstances that there was
both a desire for illicit intercourse between Mrs. Bradfield
and Fay, and that they had the opportunity to gratify that
desire.

"There is no evidence of any acts of impropriety that have
occurred between them, nor of any manifestation of affec-
tion, nor of any act of any kind at any time or place except
November 8th to indicate an illicit relation between them.
There is nothing from which I can draw the inference, until
the 8th of November, that there was any desire on the part
of these two people to have illicit intercourse.  Assuming,
however, they had such desire, and that they went to the
hotel on the 8th of November for the purpose of gratifying

it, and assuming, in view of the form of registration, that Fay intended to occupy that room with Mrs. Bradfield for the purpose of committing adultery, there is not the slightest evidence in the case to indicate that both of them were in the room at the same time prior to about eleven-forty P. M., and the rest of the evidence shows conclusively that at that hour they were both together in the room for not over one minute before they were interrupted by the entrance of Mr. Ross, Dr. Morrison and the party of detectives, and there was neither time nor opportunity for the act of adultery to have been committed then, as charged, assuming these people had the desire to commit it.

"In the absence of that proof I will have to find that the petitioner's case is not established and that his petition must be dismissed, for there is no proof and it is not seriously contended that adultery was committed on any of the other dates I have mentioned.

"On the cross-petition there is scarcely any evidence to support the charges of cruelty and improper treatment, and I find no evidence that satisfies me on that score. The only ground which counsel stresses is that Dr. Bradfield and his wife ceased cohabitation some time in 1917. They separated under articles of separation for two years; the separation continued, and as Dr. Bradfield states, his wife refused to return home until December, 1920. After she returned home they never resumed marital relations; neither of them requested it, and so far as the record disclosed neither desired it. I think the cessation of such intercourse was entirely agreeable and was by mutual consent. I have no proof to show me anything to the contrary. There cannot be actual desertion in the case because Dr. Bradfield did not leave his wife until about the 10th or 15th of March, 1923, so that the two-year period required by the statute has not expired even now, and had not, of course, expired at the time the counter-claim was filed.

"Under these circumstances I find that the counter-claim has not been established and will have to be dismissed also. You may take your decree accordingly."

*Messrs. Riker & Riker* and *Mr. Andrew Van Blarcom,* for the petitioner-appellant.

*Messrs. McCarter & English* and *Mr. George W. C. Mc-Carter,* for the defendant-respondent.

PER CURIAM.

The decree will be affirmed, for the reasons stated in the opinion delivered by Vice-Chancellor Foster in the court of chancery.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, MINTURN, KALISCH, BLACK, KATZENBACH, CAMPBELL, LLOYD, VAN BUSKIRK, MCGLENNON, KAYS, HETFIELD, JJ. ·12.

*For reversal*—None.